# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

 Plaintiff,        Case No. 1:22-CR-00029

v.            Hon. ROBERT J. JONKER
             United States District Judge

JAMES FUNARO,

 Defendant.
_____/

| **Defense Counsel** | **Assistant U.S. Attorney** |
|---|---|
| Daniel R. Fagan | Stephanie M. Carowan |
| 429 Turner Avenue NW | United States Attorney's Office |
| Grand Rapids MI 49504 | 330 Ionia Avenue NW Ste 501 |
| P:  (616) 224-2564 | Grand Rapids MI 49503 |
| fagandrlaw@gmail.com | P: (616) 456-2404 |
| | stephanie.carowan@usdoj.gov |

### DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

**NOW COMES** the Defendant, James Funaro, by his counsel, Daniel R. Fagan & Associates, P.C., and submits this Sentencing Memorandum in support of a sentence below the advisory sentencing guidelines. Such a sentence would reflect the nature and circumstances of Mr. Funaro's offense and his history and characteristics,
.

and would be "sufficient, but not greater than necessary" to serve the purposes of sentencing as set forth at 18 U.S.C § 3553(a)(2).

## INTRODUCTION

I.  UNRESOLVED OBJECTIONS TO PSIR AND SCORING

There remains one ongoing objection to the Final Presentence Report **ECF 121** that is, under paragraph 285, **ECF 121 PageID.675,** whether two additional levels under the Guidelines should be scored based on alleged "sophisticated laundering" and U.S.S.G. § 2S1.1(b)(3).

The Court will no doubt have noted that Mr. Funaro's total Offense Levels is extremely high as scored. <u>Fourteen</u> levels were added original Base Offense of 8 based on loss resulting in an augmented Base Offense Level of 22. Then, six additional points were scored based upon U.S.S.G § 2S1.1(a)(2) as set forth in paragraph 283 of the Presentence Report **ECF 121, PageID675.** <u>Four additional</u> points were scored as Specific Offense Characteristics under U.S.S.G. § 2S1.1(b)(2)(C) based upon findings that the Defendant was "in the business" of laundering funds. Finally, another additional enhancement of two additional points for "sophisticated laundering" as set forth in paragraph 285 of the Final Presentence Report **ECF 121, PageID.675** was added. That appears to be inappropriate and should not score.

Mr. Funaro's laundering of funds was anything but sophisticated. Some methods for determining whether money laundering is "sophisticated" have been set

forth in the Commentary for U.S.S.G. 2S1.1.  That Commentary includes the following list of what "sophisticated laundering" under Subsection (b)(3) means - *complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense.*  Examples include:

(i) *the use of fictitious entities,*
(ii) *shell corporations,*
(iii) *two or more layers of transactions……..involving criminally derived funds that were intended to appear legitimate or*
(iv) *offshore financial accounts.*

Mr. Funaro's financial activity in connection with ExpressPCT was not designed to conceal.  That is evident from the fact that his company involved in this activity (Valiant Capital) was explicitly incorporated by Mr. Funaro under his own name.  *See* PSR paragraph 104 **ECF 121, PageID.647.**  Most tellingly, Mr. Funaro directed purchasers through www.payanywayexchange.com to add his own name, James Funaro, to facilitate the transfer of funds throught to ExpressPCT.  *See* PSR paragraph 103, **ECF 121, PageID.647.**

Mr. Funaro was transparent in his laundering.  An example of "sophisticated laundering" might well be the creation of two sets of books or the renaming of proceeds to some other form of proceeds.  Using his own name to facilitate "laundering" should make it clear to this Court that Mr. Funaro was not involving himself in "sophisticated laundering".  It is rather indicative of the approach that Mr. Funaro took to his entire involvement with ExpressPCT.  Mr. Gagne needed help

.

figuring out how to make it easier to receive payment for the medications and supplements that he was providing to customers.  Mr. Funaro knew how to make it easier for customers to pay.  It should be noted, however, that even Mr. Gagne did not believe that Mr. Funaro's hiring noticeably changed the volume of orders on the U.S. warehouse portion of ExpressPCT (*See* PSR Paragraph 251, **ECF 121, PageID.669**.)

It should further be noted that ExpressPCT was deeply involved in cryptocurrency *before* Mr. Funaro was involved as *all* transactions were paid for by customers by cryptocurrency *before* ExpressPCT hired Mr. Funaro.  (*See* PSR Paragraph 250 **ECF 121, PageID. 669**.)  All of the "sophistication" of this operation was in place before Mr. Funaro joined the conspiracy.  His actions actually revealed transactions and did not hide them.

The Court should additionally be aware, although the laundered funds in this matter results in a loss figure of at least $1.39 million dollars being scored against Mr. Funaro, it is quite clear that Mr. Funaro did not himself receive anything over $100,000.00 during his entire involvement with ExpressPCT.  *See* paragraph 351 **ECF 121, PageID.686.**  While Mr. Gagne and Mr. Lucien and others may have gotten rich, Mr. Funaro did not. Some defendants drove Maseratis.  Mr. Funaro didn't own a car.

Mr. Funaro has acknowledged that his involvement with ExpressPCT was harmful to his own well-being, and he eventually found his involvement so harmful that he stopped being involved.  Mr. Funaro's work with ExpressPCT began

approximately in December of 2020 and Mr. Funaro stopped working with ExpressPCT in October of 2021, meaning that his involvement in this matter lasted no more than 10 months.  He was given an opportunity to get involved again in processing payments for ExpressPCT after October 2021, but he declined that offer because he had determined the conduct was wrong.  *See* PSR paragraph 193 **ECF 121, PageID.660.**

Mr. Funaro, immediately after being indicted in this matter, approached the government and asked whether he could proffer and do all in his power to expose the conduct of ExpressPCT he had been involved in.  He willingly made his laptop available to the government and offered to do anything at all in his power to assist the government in its ongoing investigation.  Mr. Funaro's assistance is laid out clearly in PSR paragraphs 179 – 195 **ECF 121, PageID.659-661.**

Counsel does respectfully request that this Court consider Mr. Funaro's own determination to quit this business and to not reengage as clear evidence that he has already discerned that he could not and would not be involved in any such conduct in the future.

## II. NATURE AND CIRCUMSTANCES OF MR. FUNARO'S OFFENSE

Mr. Funaro has pled guilty to Conspiracy to Launder Money.  Mr. Funaro has never been involved in anything like this offense before.

Mr. Funaro is highly intelligent, although showing remarkedly bad judgment in

.

this particular matter. This is, obviously, his first contact with the Federal Criminal Justice system and nearly his first contact with any criminal system.

Mr. Funaro provided technical solutions to a criminal enterprise. It was certainly wrong to do so. He knows it was and he has put all of this behind him.

He has, since his arrest and being placed on bond, complied entirely with all requirements of bond, worked gainfully, saved money (which he intends to use to pay off required restitution) and has otherwise prepared himself for sentencing and determined to be a force for good in his community. If he is incarcerated he intends to be a force for good even <u>within</u> the prison system as he is trying to become qualified to teach math for inmates in the Bureau of Prisons. He hopes to do so. Mr. Funaro is a gifted mathematician.

All of these things show substantial reasons why the Court should, regardless of whether it grants counsel's objection to paragraph 285 **ECF 121 PageID675**, vary downward substantially from the enormous sentence which would result from the current advisory Sentencing Guidelines.

Counsel is confident that Mr. Funaro will never again be involved in any criminal conduct and will in fact be of assistance to his fellow man in the future, if incarcerated and afterward.

A.   **MR. FUNARO'S HISTORY AND CHARACTERISTICS**

Mr. Funaro has virtually no criminal history. He is 36 years old and was raised in New York.

It is significant to note that Mr. Funaro, while he is in good health, reports having significant vision difficulties identified as corneal dystrophy. *See* PSR paragraph 316 **ECF 121, PageID 679.** He is hopeful that he will be able to obtain surgery on this condition before he might be required to be incarcerated.

Mr. Funaro's mental and emotional health are solid and he additionally has no difficulties with substance abuse. He has been gainfully employed all of his adult life, and most recently has been working in Atlanta, Georgia where he helps in the operation of a bar/restaurant.

As the PSR reports in paragraph 331, **ECF 121, PageID.681** he has earned some assets and is apparently careful with his money, and has in fact earmarked some of his assets for his restitution payments, as noted earlier. It is significant to note that one of Mr. Funaro's monthly expenses is a scooter rental, a jarring difference between him and his co-defendant Maserati owners. In fact, the PSR **ECF 121, PageID.681**, reports Mr. Funaro lives an organized, lawful and disciplined life and his current financial condition clearly indicates that he is well capable in the future of living lawfully and well.

B.     **TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE**

As the Court is well aware, 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed…. To reflect the seriousness of the offense, to promote

respect for the law, and provide just punishment for the offense." These sentencing objectives set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just desserts," theory considers only the Defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, Retribution examines the actor's degree of **blameworthiness** for his or her past actions, focusing on the offense being sentenced….Third, the degree of blameworthiness of an offense is generally assessed according to **two kinds of elements:** the **nature and seriousness of the harm caused or threatened** by the crime; and the **offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity.**

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Mr. Funaro plainly understands the seriousness of the offense. His conduct is exemplary of how the Court would want a Defendant to accept responsibility for previous misconduct. It does not seem necessary, in counsel's opinion, that Mr. Funaro be incarcerated for any lengthy period of time, regardless of the Guideline scoring in this matter. He is, in a sense, a Defendant outside the heartland of typical defendants. His ready abandonment of his criminal conduct well before he was indicted is a clear indication of a man who does not need to be imprisoned to learn his lesson. Just punishment for Mr. Funaro, counsel argues, has already been imposed by

.

this very felony conviction. Mr. Funaro does in fact respect the law and came to an understanding of the wrongness of his conduct before charge or punishment, unlike many Defendants this Court sees. Just punishment for Mr. Funaro does not need even to include incarceration, in counsel's opinion. A sentence requiring restitution be paid, which ability is evident from his current financial status, provides this Court with what would be the most appropriate punishment of Mr. Funaro. Counsel suggests that such punishment would be just.

C.   TO AFFORD ADEQUATE DETERRANCE TO CRIMINAL CONDUCT

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed….to afford adequate deterrence to criminal activity." A leading scholar on federal sentencing is debunking the myth that lengthy sentences have a deterrent effect. She writes:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the Judge is "marginal deterrence," *i.e.,* whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006).

Amy Baron Evans, Sentencing By the Statute (April 27, 2009, revised December 21, 2010),

htts://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf.

Mr. Funaro does not need to be deterred from criminal conduct as he has already learned that he should not be involved in criminal conduct and will not be in the future.

**D.     TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. FUNARO**

It is virtually certain that Mr. Funaro will not be involved with further crimes. He is insightful of his wrongdoing, penitent of it and fully desires to make good on any harm he may have caused.  His history and again his decision to withdraw from criminal conduct are strong evidence that the public does not need further protection from crimes by Mr. Funaro.

**E.     TO PROVIDE MR. FUNARO WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.**

Mr. Funaro has been accessing college programming since his arrest and release in this case.  Mr. Funaro may be obtaining his Ph.D. in mathematics in the relatively near future.  It is clearly not necessary for him to be in prison to continue to receive educational or vocational training or other care.

**F.     THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT**

This Court is aware of the variety of Defendants in this case and the sentences

which are likely to be imposed. The Guidelines for Mr. Funaro appear to counsel to be wildly in excess of what they should be for his conduct, albeit other co-defendants were involved in different <u>types</u> of conduct, much of it much more lucrative.

**G.    CONCLUSION**

Letters from Mr. Richard Mauney and Mr. Henry are attached to this Sentencing Memorandum. They demonstrate Mr. Funaro's thoughtfulness and integrity.

Because a sentence well below the low end of the advisory guideline range is already recommended by the Presentence writer, and because a prison sentence is arguably greater than necessary in this case to accomplish the goals of sentencing under 18 U.S.C. § 3553(a), Mr. Funaro, through counsel, requests that he be sentenced to some alternative to incarceration as this Court sees best fit.

Respectfully submitted,

**DANIEL R. FAGAN & ASSOC., P.C.**

Dated: <u>February 16, 2023</u>

By   /s/ Daniel R. Fagan
     Daniel R. Fagan (P39735)
     Attorney for Defendant

.