UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAMES FUNARO,

        Defendant.
_____/

No. 1:22-cr-00029-RJJ

HON. ROBERT J. JONKER
United States District Judge

## UNITED STATES' SENTENCING MEMORANDUM

Defendant James Funaro and several other co-conspirators participated in an extensive scheme to smuggle unapproved, misbranded prescription drugs and controlled substances into the United States for distribution to customers who purchased the illicit drugs on a website – www.ExpressPCT.com. While Funaro assisted in the smuggling scheme directly, his primary role in the organization was to process payments that customers made using digital payment networks like Zelle and Cash App. Funaro worked with others to route these payments through multiple bank accounts, including an account for a sham corporation he created, before converting the funds to cryptocurrency and sending them overseas. Funaro designed the payment scheme to conceal the proceeds from ExpressPCT and to allow co-conspirators to continue the drug smuggling enterprise. Funaro now comes before this Court having pled guilty to one count of conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). For the reasons discussed below, the Court should sentence Funaro to a term of incarceration.

1

I.  **Background**

In July 2020, investigators discovered two websites – www.ExpressPCT.com ("ExpressPCT") and www.ExpressPEDS.ws ("ExpressPEDS") – that sold unapproved, foreign manufactured prescription drugs as well as anabolic steroids and some Schedule III and Schedule IV controlled substances in the United States without requiring a prescription. The owners of the websites, including co-defendant Brendon Gagne, marketed their products largely to individuals in the bodybuilding community who used performance enhancing drugs ("PEDS") and then needed post-cycle therapy drugs ("PCT") to address the side effects of steroid use.

ExpressPCT itemized the products on the site into categories based on where the products shipped from or to, including a page labeled "USA Products." (R.121: PSR, PageID.636.) The USA Products page stated that it provided "USA Domestic Service," was "Only available to USA," and it allowed customers to receive packages via the United States Postal Service ("USPS"). *Id*. The following is a screen shot of the "USA Products" page as it appeared on ExpressPCT during the pendency of the conspiracy:



In order to obtain the drugs for sale on ExpressPCT legally, a person in the United States must have a valid written prescription from a doctor or other licensed medical practitioner. (*Id.*) However, ExpressPCT did not require its customers to provide a prescription to purchase any of the drugs on the site. (*Id.*)

Laboratories overseas manufactured the drugs sold on both ExpressPCT and ExpressPEDS. At no time did those laboratories seek the approval of the Food and

3

Drug Administration ("FDA") to distribute the drugs in the United States. Instead, various individuals both in the United States and abroad arranged for the drugs to be concealed in packages and shipped in bulk to the United States to domestic "re-distributors." The packages did not declare their illicit contents and instead took steps to conceal their true nature. For example, conspirators frequently concealed the drugs inside cosmetic boxes and declared on customs forms that the drugs were, instead, "cosmetics" or "gifts." (*Id.*)

Once the packages arrived in the United States, the re-distributors repackaged the bulk orders into US Postal Service shipping boxes, relabeled the boxes with new labels, showing a US-based return address, and shipped them to second tier US-based distributors who then finally shipped the drugs to the customers. Conspirators designed the labels and packaging to make the purchasers think their drugs came from the United States and not from overseas. (*Id.*)

Funaro was involved in the smuggling scheme. However, his role in the drug conspiracy was more limited. Rather than receiving international packages of drugs and forwarding them to other co-conspirators or to customers directly, Funaro's involvement in the smuggling primarily involved communicating with customers about their orders and their payments. *See* Ex. 1. Instead, Funaro's primary role in the conspiracy was laundering the proceeds of the smuggling.

Customers purchasing drugs on ExpressPCT could pay for their drugs in a number of ways. First, they could pay directly through the website using Bitcoin. Alternatively, they could pay through wire transfer, eCheck, or through a number of payment processors, including Zelle, Google Pay, Skrill, Xoom, and CashApp. (R.121:

4

PSR, PageID.635.) If a customer chose to pay via Zelle or CashApp or another similar payment method, they were directed to a website owned by Funaro – www.PayAnyWayExchange.com ("PayAnyWay"). The following is a screenshot from ExpressPCT explaining to customers how to pay via payment processor:




> **How to pay using Zelle Pay (US ONLY)**
>
> 1. Make an order on ExpressPCT
> 2. Get your Order Number. This can be found in the email sent to you by us, please check your spam folder as it is very likely to be there if you use Gmail!
> 3. Visit payanywayexchange.com and follow further instructions on that page.
>
> Please be advised we process all payments at the end of each day in one large batch, so it may take 24 hours until you receive payment confirmation via email.
>
> Please do not email our payment processor about any tracking or order information as they are only able to assist with payment related queries!

Once on PayAnyWay, customers received instructions as to how to process their payments. (*Id.* at PageID.635.) Specifically, the payment site instructed customers only to include their order numbers and nothing specific about www.ExpressPCT.com or prescription drugs in their payments. The site also instructed customers to list the recipient of their payment as valiantcapitalone@gmail.com – an email address registered to Funaro. For funds sent via Zelle specifically, the website also suggested that customers use Funaro's name if necessary to transfer the required funds. Finally, customers were instructed to send both CashApp and Zelle payments to handles linked to Funaro. (*Id.* at PageID.635, 646-648.) The following is a screenshot from PayAnyWay outlining how customers should structure their payments for the drugs they purchased on ExpressPCT:



Funaro routed many of the funds paid through PayAnyWay to bank accounts of a company called Valiant Capital, which Funaro owned. Valiant Capital was a front company. It did not have employees or business of any kind but served to move money

sent in payment for illegal prescription drugs. Once funds were sent to Valiant Capital, Funaro routed payments to his personal bank accounts. (*Id.* at PageID.646-648.)

Payments that were not sent first to Valiant Capital were sent instead to Funaro's accounts directly. In all cases, Funaro then routed the funds to his accounts at Gemini Trust and Coinbase, two digital currency exchanges, where the funds were converted to cryptocurrency. Funaro then transferred most of the funds to yet another cryptocurrency wallet at Electrum. The Electrum wallet was controlled by Funaro's co-conspirators. Once the funds arrived in the Electrum wallet, co-conspirators then dispersed them to a number of locations, including to accounts the owners of the website as well as to pharmaceutical companies in India in order to acquire additional prescription drugs and continue the scheme. (*Id.*)

Funaro coordinated his money movement with the owners of ExpressPCT, including co-defendant Gagne. Together, the conspirators took steps to conceal the source of the funds and also used them to promote the continuation of the scheme but investing them in additional prescription drugs and also paying several redistributors. (*Id.*)

The above facts led to Funaro pleading guilty to one count of conspiracy to launder money. He now comes before the Court for sentencing. For the reasons outlined herein, the United States recommends that the Court impose a sentence of incarceration.

II.   **United States Sentencing Guidelines**

The first step in the sentencing process is to calculate the advisory Guideline range applicable to the offense of conviction. Here, the parties agreed that range should be calculated using the money laundering Guideline, U.S.S.G. § 2S1.1.

Section 2S1.1 calculates a defendant's base offense level in one of two ways. First, a sentencing court can look to the "offense level for the underlying offense from which the laundered funds were derived" if that level can be determined. *Id.* at (a)(1). If that level cannot be determined, then the defendant's base offense level is 8 and then that level is increased based on the number of offense levels from the fraud table (U.S.S.G. § 2B1.1) corresponding to the value of the laundered funds. *Id.* at (a)(2).

Here, while Funaro participated in the drug smuggling scheme – the underlying offense from which the laundered funds were derived – the offense level corresponding to his participation cannot be determined. Unlike his co-defendants, Funaro did not receive international packages of prescription drugs or fulfill customer orders. Instead, his main role in the smuggling scheme was interacting with customers online, answering questions about orders and payments. For example, in December 2020, Funaro had a conversation via Facebook messenger with a customer of ExpressPCT. The customer sent Funaro a message about placing "another order like I did before" to which Funaro responded, "Hey yes how many packs? Come in ten packs of 100mg." Funaro then quoted the customer $5/pack for the order and said, "I go through and work with ExpressPCT.com now so go there, and I'll help you with payment later." Funaro then shared links to both www.ExpressPCT.com and

9

www.ExpressPEDS.ws with the customer. *See* Ex. 1. During the same conversation, Funaro also instructed the customer to pay him directly via Zelle or CashApp and specifically told the customer to just put the order number in the memo – no other information. (*Id*. at p. 2.)

Because Funaro's participation in the scheme did not involve receiving packages, it is difficult to ascertain what the "loss" would be in his case. For that reason, the PSR correctly applied U.S.S.G. § 2S1.1(a)(2), starting with an offense level of 8 and then adding 22 levels based on Funaro's laundering of $1,394,645.50. (R.121: PSR, PageID.675.) The investigation determined the amount of funds laundering by reviewing Funaro's financial accounts. Specifically, as outlined in the PSR, the following table represent the amount of laundered funds from payment options such as CashApp, eCheck, Zelle, Skrill, and Google Pay:

| **Source** | **Amount** |
|---|---|
| CashApp | $ 76,3179.46 |
| eCheck (Bank of America – 2 Accounts) | $ 91,698.25 |
| eCheck (J.P. Morgan Chase – 2 Accounts) | $ 91,083.08 |
| Zelle (BOA – 3 Accounts; JPMC – 1 Account) | $ 409,570.16 |
| Skrill | $ 20,832.71 |
| Google Pay | $ 17,981.84 |
| | |
| **Total:** | $ 1,394,645.50 |

(R.121: PSR, PageID.647-648.)

The other enhancements applied in the PSR are likewise proper. As Funaro admitted in his plea agreement, the smuggling activity involved not only misbranded prescription drugs but also "Schedule III and Schedule IV controlled substances." (R.61: Plea Agmt., PageID.196.) Because the sale of controlled substances generated

10

proceeds that Funaro then subsequently laundered, his offense level should be increased by six points. U.S.S.G. § 2S1.1(b)(1). Likewise, Funaro was in the business of laundering funds – that was his only job at the time he participated in the scheme. As such, his offense level should thus be increased by an additional four points pursuant to U.S.S.G. § 2S1.1(b)(2)(C). (*See* R.121: PSR, PageID.675.)

Funaro agrees with the Guideline calculations outlined above. His only objection to them is the PSR's decision to increase his offense level an additional two points based on the fact that the money laundering conspiracy involved "sophisticated laundering." U.S.S.G. § 2S1.1(b)(3).

### A. Sophisticated Laundering

The PSR increases Funaro's offense level by two points based on the conspiracy's use of sophisticated laundering techniques. The enhancement is appropriate here. As the PSR correctly notes, the money laundering scheme involved the use of a shell corporation – Valiant Capital. (R.121: PSR, PageID.688.) Funaro layered the transactions, funneling money through multiple bank accounts. He also then converted the funds to cryptocurrency and then sent them overseas. (R.61: Plea Agmt., PageID.197.) Funaro admitted to all of these facts as part of his plea agreement. (*Id.* at PageID.196-198.)

The Guidelines provide for a two-level increase in a defendant's sentencing range for money laundering where "the offense involved sophisticated laundering." U.S.S.G. § 2S1.1(b)(3). "Sophisticated" has a number of definitions depending on the context in which it is used. As relevant here, Merriam-Webster defines "sophisticated" as "highly complicated or developed; complex." In the context of money

11

laundering, courts have upheld a sentencing enhancement for sophisticated laundering in cases where transactions were layers or involved multiple transfers designed in part to make the transactions appear legitimate. *United States v. Vela-Salinas*, 677 F.App'x. 224, 231 (6th Cir. 2017).

The Guidelines, through their application notes, provide a non-exhaustive list that may indicate sophisticated laundering, including using fictitious entities, shell corporations, or layered transactions or otherwise utilizing offshore financial accounts. U.S.S.G. § 2S1.1, App. N. 5. While these factors are illustrative rather than required, *see United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013), they can provide the Court some context in evaluating whether Funaro used sophisticated laundering techniques here.

Ultimately, Funaro utilized numerous sophisticated laundering techniques. He layered transactions, moving money from Valiant Capital's accounts to his personal accounts to cryptocurrency accounts before moving the money offshore. (R.61: Plea Agmt. PageID.196-197.) He used a shell corporation – Valiant Capital. *Id*. His website – PayAnyWay – specifically instructed customers not to reference the names or descriptions and to *only* reference order numbers. These efforts at concealment are sufficient to increase the offense level by two points for the use of sophisticated laundering.

### III.   Sentencing Factors Under 18 U.S.C. § 3553(a)

Finally, in devising a sentencing in this case, the Court must consider the sentencing factors under 18 U.S.C. § 3553(a). *United States v. Hall*, 632 F.3d 331, 335 (6th Cir. 2011) (citing *United States v. Alexander*, 543 F.3d 819, 822 (6th Cir. 2008)

(citing *Gall v. United States*, 552 U.S. 38, 51 (2007))). Specifically, the Court must endeavor to impose a sentence that is "sufficient but not greater than necessary" to achieve the statutory goals outlined by Congress. *See* 18 U.S.C. § 3553(a). In imposing sentence, the Court should look to certain statutory factors, including, but not limited to, the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. *Id.*

Here, the money laundering scheme was extensive. It involved a sham corporation, numerous bank accounts, and the conversion of proceeds to cryptocurrency. The cryptocurrency was then sent to co-conspirators or sent overseas. Because of the nature of cryptocurrency, the proceeds ultimately became difficult if not impossible to track, particularly once they were transferred out of the United States.

The scheme also involved a significant amount of money – more than $1.3 million. And it lasted for more than a year. During that time, Funaro and his co-defendants profited either via cash or free prescription drugs all while defrauding the government and leading their consumers to believe they were buying approved medications from US-based pharmaceutical companies.

This is not Funaro's first drug related conviction. He was previously convicted of cocaine possession. (R.121: PSR, PageID.676.) What's more, his attitude in this case is concerning. As he told the PSR writer, Funaro knew his actions here were

13

illegal, but "he did not believe anyone would care about the sale of generic medications." (*Id*. at PageID.673.) This cavalier attitude should be considered by the Court in fashioning a sentence in this case.

Finally, this Court should look to general deterrence as a goal here. Funaro's attitude that no one would care about illegally selling prescription medications is shared by many others, particularly in the bodybuilding industry. Bodybuilders and MMA fighters like Funaro routinely use anabolic steroids and then have to go to extraordinary lengths to obtain the post-cycle therapy (PCT) drugs they need to treat the side effects of their drug use. If individuals like Funaro and his co-defendants can defraud the government for years, make millions of dollars, and obtain cheap prescriptions to support their drug habits all without having to face significant consequences, they will be emboldened to continue perpetrating similar schemes in the future. For this and for all of the other reasons outlined herein, the Court should sentence Funaro to a term of imprisonment.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Date: February 17, 2023

*/s/ Stephanie M. Carowan*
STEPHANIE M. CAROWAN
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501
(616) 456-2404