```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE WESTERN DISTRICT OF MICHIGAN

 3                            SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5            Plaintiff,                    No.  1:22cr29

 6       vs.

 7      JAMES FUNARO,

 8            Defendant.

 9

10      Before:

11                        THE HONORABLE ROBERT J. JONKER,
                               U.S. District Judge
                              Grand Rapids, Michigan
12                          Monday, February 27, 2023
                              Sentencing Proceedings
13
        APPEARANCES:
14
                         MR. MARK A. TOTTEN, U.S. ATTORNEY
15                       By:  MS. STEPHANIE M. CAROWAN
                         330 Ionia Avenue, NW
16                       P.O. Box 208
                         Grand Rapids, MI 49501-0208
17                       (616) 456-2404

18                              On behalf of the Plaintiff;

19                       MR. DANIEL R. FAGAN
                         Daniel R. Fagan & Associates, PC
20                       429 Tuner Avenue, NW
                         Grand Rapids, MI 49504
21                       (616) 224-2564

22                              On behalf of the Defendant.

23
        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
24

25
```

1      02/27/2023

2      (Proceedings, 4:10 p.m.)

3      THE CLERK:  The United States District Court for the

4  Western District of Michigan is now in session.  The Honorable

5  Robert J. Jonker, United States District Judge, presiding.

6      THE COURT:  All right.  We're here today on the case

7  of the United States against James Funaro, 1:22cr29, the second

8  Defendant, and it is the time set for sentencing, so let's

9  start with appearances, please.

10      MS. CAROWAN:  Good afternoon, Your Honor.  Stephanie

11  Carowan on behalf of the United States.

12      THE COURT:  All right.

13      MR. FAGAN:  Good afternoon, Your Honor.  Daniel Fagan

14  on behalf of Mr. Funaro.

15      THE COURT:  All right.  Thank you, and welcome

16  everyone.

17      Let me start in with a summary of what I have received

18  and make sure you all have the same things and have gone

19  through them.  Of course, I have the presentence report from

20  our probation officer with a lot of details.  I do have the

21  government sentencing memo on general issues as well as a 5K

22  departure motion asking for two levels.  I have a Defense

23  sentencing memo, along with a motion for variance, and a series

24  of letters from the Defense.  They have come in in waves, some

25  in batches, some separate, but I do have several including I

1     think one or maybe two I received today.

2          I think in terms of sentencing -- oh, and the other

3     thing that I have is the government motion for the forfeiture

4     money judgment.

5          Anything else I should have from the government?

6          MS. CAROWAN:  No, Your Honor.  Thank you.

7          THE COURT:  Mr. Fagan, anything I am missing from the

8     Defense?

9          MR. FAGAN:  No, Your Honor.  Some of those letters

10    were -- I regret, came today, but I received them today.  I got

11    them to you as quickly as I could.

12         THE COURT:  Okay.  All right.  This was a case that

13    came in under a plea agreement that did call for dismissal of

14    some of the charges.  Mr. Funaro pleaded guilty to Count 2, the

15    money laundering conspiracy.  The agreement was the government

16    would move to dismiss the other charges, the smuggling

17    conspiracy and the standalone count on money laundering.  I do

18    think under 6B1.2 of the guidelines and related authority

19    that's an appropriate resolution of the case that honors the

20    purposes of sentencing, so I am accepting that and would invite

21    the government's motion to dismiss the affected charges.

22         MS. CAROWAN:  Your Honor, at this time the United

23    States moves to dismiss Counts 1 and 3 of the indictment as to

24    Mr. Funaro.

25         THE COURT:  All right.  Thank you.  I will grant that.

1           And then we move to guidelines, which have a number of

2    issues between what I have raised and at least one of which the

3    Defense has raised.  So let me at least identify those issues

4    and then go from there.  Everybody, I think, is on the same

5    page on criminal history.  There were two points scored, which

6    categorizes Mr. Funaro at criminal history category II.  I

7    didn't see any objections to that.  The level of offense under

8    the laundering guideline is an issue that didn't specifically

9    raise objections.  The question I had and really wanted the

10   parties to address with me today is why we would be under

11   (1)(b) instead of (1)(a), because -- or I guess it's (a)(1)

12   instead of (a)(2).  Let me say it that way, because (a)(1)

13   applies when the individual is accountable for the underlying

14   offense, and I think Mr. Funaro is here, even though it's

15   dismissed.  That is the smuggling, and I think we can address

16   meaningfully what the underlying smuggling offense would mean

17   for Mr. Funaro on these numbers.  I realize we couldn't do it

18   with packages because he didn't get any, but packages was just

19   one of two factors that was used to calculate a dollar amount.

20   The other being average package value, and here we have a

21   dollar amount built in, namely, the dollars that flowed through

22   the website, every one of which, as I understand it, was part

23   of the dollars spent on these drugs to be smuggled.  So I would

24   think that's the starting point under the same kind of loss

25   analysis with its limitations that apply under 2B1.1 to the

1    other Defendants, and I'd be inclined to go there as opposed to

2    the (a)(2), which is the alternative scored in the PSR.

3            So let me just start with that issue since it does

4    drive some of the other ones, not all, from the government's

5    perspective first and then from the Defense.

6            MS. CAROWAN:  Thank you, Your Honor.

7            And I appreciate the Court flagging the issue prior to

8    the hearing today to give us an opportunity to both consult

9    with each other and to consult the relevant guidelines.

10           I do think the Court's position is well taken in light

11   of the fact that we are in an ability now to make calculations

12   that perhaps initially we did not think we were in a position

13   to calculate.  I think both Defense counsel and I looked at

14   this and said Mr. Funaro didn't receive packages in the same

15   way that many of the co-conspirators did in the smuggling

16   conspiracy, and therefore, have struggled I think to calculate

17   what those would be valued at under 2B1.1 such that we could

18   make a guideline calculation for the underlying offense.

19           I think, though, now, having looked back at sort of

20   where we are on this smuggling conspiracy and the cross

21   reference to 2B1.1, and then the use of that application note

22   3(F)(v) which talks about using the amount paid for the

23   property, goods or services transferred in cases like this, I

24   do think we can make an accurate assessment of Mr. Funaro's

25   liability under 2D1.1.  I think the 1.394 million and change

1    number that is in the plea agreement corresponds to the amount

2    paid for the various drugs via the money laundering system that

3    was developed and employed by Mr. Funaro.

4         So I think that should be the starting point for the

5    Court from the government's perspective.  I think that

6    corresponds under 2B1.1 to a plus 14, and would obviously

7    eliminate the six-point drug enhancement under 2S1.1 as well,

8    so I think at this point is the government's position.

9         THE COURT:  All right.  Thank you, Ms. Carowan.

10        Mr. Fagan?

11        MR. FAGAN:  Thank you.

12        I have some agreement with the prosecutor.  I will not

13   say, though -- with the U.S. Attorney.  I will not say, though,

14   that I suppose that he employed methods of causing this

15   laundering to proceed, otherwise, he wouldn't be here.  If he

16   weren't involved the dollars wouldn't have gone through his

17   accounts.  I understand that.  But I do want to highlight the

18   fact that the entire system was already in place before he was

19   involved, and according to even Mr. Gagne himself, my client's

20   subsequent involvement in the process did not result -- as I

21   think I noted in my sentencing memorandum, did not result in

22   additional money flow according to Mr. Gagne himself.  So my

23   client did get involved, but I don't think he was in any

24   possible way could he be seen as someone who created or

25   developed the program that Mr. Gagne did put together.

1    Responding to the question on the guideline, I find

2    myself agreeing with -- agreeing with the U.S. Attorney.  I

3    know that in their sentencing memorandum they had noted that it

4    was not going to be -- they said on page 9, the offense level

5    corresponding to his participation cannot be determined.  But

6    as I looked back through it, and we discussed this some

7    further, it seems quite possible for the Court to make a

8    determination, and I think it's important that the Court do so

9    and that the change in the guidelines be reflected because at

10   the very least, there would be a gross discrepancy between my

11   client, and I can't say exactly similarly situated people but

12   similarly situated people, and that would be inappropriate.

13   I would argue that -- so I am agreeing with the

14   government that these guidelines can be figured under (a)(1).

15   THE COURT:  All right.

16   MR. FAGAN:  2S1.1(a)(1).  I believe my client was

17   essentially a technician who plugged into an existing

18   laundering enterprise.  And as the Court is well aware, when

19   he -- when he began to smell crooked enough he left and never

20   returned.

21   THE COURT:  All right.

22   MR. FAGAN:  Thank you.  Thank you.

23   THE COURT:  Yes.  Thank you.

24   So for planning purposes, in identifying the other

25   guideline issues, after hearing from counsel, I think I do

1    intend to go under the 2S1.1(a)(1) branch for the reasons that

2    Ms. Carowan summarized and Mr. Fagan echoed, namely, that as

3    the case developed -- and I know it's been some time and it

4    makes me in a way glad that we have waited to try to cluster

5    the sentencings around the same time so that I have a better

6    idea of the whole -- the whole picture, I think we can

7    meaningfully connect Mr. Funaro's relative culpability using

8    the same 2B1.1 guideline that applies to the smuggling offense

9    for the others.  So we would start, then, at the base level

10   six.  I would use the $1.3 million number that was part of the

11   plea agreement for Mr. Funaro as part of the dollars that

12   flowed through the site for the money laundering, and I think

13   the application note special rule that Ms. Carowan references

14   is the right one.  That's what we are measuring is the retail

15   value of those misbranded drugs.  We don't need to do it with

16   packages in this case and an average value per package because

17   we actually have that top line or bottom line number depending

18   on how you look at it.  So I think the plus 14 would apply.

19        When we get to the specific offense characteristics,

20   the (b)(1) falls out because that only applies if you are under

21   the (a)(2) prong.  So there is no six-level adjustment, and

22   then under the next specific offense characteristic, the one

23   that was applied for the business of laundering doesn't apply,

24   but the middle one does because Mr. Funaro was convicted under

25   § 1956, so he'd get two levels there.  And then the parties

1    have disputed and have briefed the sophisticated laundering

2    issue.  That's the two-level issue under (b)(3).

3            So let me see from Ms. Carowan's -- bless you,

4    Ms. Carowan.

5            MS. CAROWAN:  Thank you, Your Honor.

6            THE COURT:  -- Ms. Carowan's perspective if we have

7    any other guideline issues from your perspective, other than

8    the sophisticated laundering at this point?

9            MS. CAROWAN:  The only thing I would briefly flag for

10   the Court is if we are calculating offense level back under

11   2B1.1, there actually is a sophisticated means enhancement

12   under that chapter as well that we've talked about in other

13   cases but may be more applicable here.  My understanding, I

14   have looked at a couple of cases from the Sixth Circuit today

15   that you actually can apply both sophisticated laundering and

16   sophisticated means as long as the sophisticated means is

17   different conduct than the sophisticated laundering.

18           THE COURT:  Right.  I think that's right.

19           MS. CAROWAN:  So from that perspective that would be

20   the only specific event characteristics under 2D1.1 that may be

21   in play.  I know the parties didn't brief it.

22           THE COURT:  Are you contending they both should apply

23   here, not just the sophisticated laundering?

24           MS. CAROWAN:  I think given the international

25   component to the sophisticated means enhancement in particular,

1   I think that there is an argument for that to apply in that

2   particular case.  I think as far as the specific -- the second

3   prong of sophisticated means where it talks about what this

4   specific Defendant did, I think there is going to be overlap

5   between that and the sophisticated laundering, so I wouldn't

6   argue under that particular provision, but certainly the

7   international component to this scheme, Mr. Funaro was the one

8   responsible for moving a lot of the money off shore to various

9   co-conspirators, also to the Indian pharmaceutical companies to

10  promote the continued operation of the laundering enterprise.

11      THE COURT:  All right.  Okay.  So from your

12  perspective, Mr. Fagan, other than the sophisticated laundering

13  and potentially the sophisticated means, are there any other

14  guideline issues from your perspective?

15      MR. FAGAN:  No, and I appreciate the Court's --

16      THE COURT:  Okay.  Let's do this.  Let's hear both

17  sides' full package of sentencing issues, both the

18  sophisticated means and sophisticated laundering issue,

19  anything else the parties want to address, guidelines or

20  otherwise, allocution.  I'd like to hear the whole thing, and

21  then I'll make my rulings and we'll go from there, and I'll

22  start with Mr. Fagan.

23      MR. FAGAN:  Well, thank you, Your Honor.

24      I have noted in several spots, and I know the Court

25  has read it in my memorandum, I noted ways that I think that

1    Mr. Funaro's conduct was particularly unsophisticated, and I

2    think we can say that it's sophisticated, the government can

3    say it's sophisticated because of the cryptocurrency

4    connection, but I want to remind the Court that cryptocurrency

5    was the way that Mr. Gagne did his business, and that

6    Mr. Funaro didn't come to him and say, hey, I've got a great

7    idea.  Let's use cryptocurrency.  What happened was Mr. Funaro

8    simply plugged into an existing system.  Mr. Gagne was using

9    cryptocurrency.  Mr. Gagne was making purchases internationally

10   using cryptocurrency, and Mr. Funaro simply made it possible to

11   use the other cash moving devices that exist in American --

12   with American customers, and that Mr. Gagne did not have all of

13   that technology and my client did.

14            However, as I already noted, even though my client got

15   involved just -- I guess this is part of allocution, but even

16   though my client got involved in the business, Mr. Gagne's

17   business did not increase in orders according to -- I noted it

18   in my sentencing memorandum, but it was noted in the -- in the

19   presentence report as well.

20            THE COURT:  It was from Mr. Gagne's proffer.

21            MR. FAGAN:  Yes.  From Mr. Gagne's own perspective.

22   He didn't note that my client's involvement created any

23   increase in volume of orders.

24            So I understand -- back to --

25            THE COURT:  The potential counterpoint to that is

No. 1, we are not sure how credible Mr. Gagne should be in that, but also if 1.3 million flowed through the site, and we've only been able to account for about 300,000 in the packages, then there's $700,000 missing in the scheme, right? And so is that because the value went up when the -- you know, the new payment options came into place, or is it that we've missed a whole bunch of packages that were flowing all along the way?

MR. FAGAN:  Well, I think the one person who wouldn't know would be Mr. Funaro, who has simply established the steps that the money would proceed through.  He wouldn't know.  He didn't receive that money.  He took for his -- for his profit, he took five percent of some of that money flowing through. That's my understanding.

So Your Honor, I don't have any answer to that, although I suppose maybe Mr. Gagne does, but my client didn't end up with the money, and nobody has suggested he has.  I think other things that we have read about Mr. Funaro make it pretty clear that he was not squirrelling away money.

Your Honor, as far as the sophisticated means itself goes, I researched what it meant, and I looked at the notes, and I looked at cases, and I would have said that something sophisticated is something where you are attempting to hide as much as you can hide, and Mr. Funaro doesn't meet that in any possible way.  Valiant was founded by him and under his name,

1    and public record, other references to other financial

2    transactions that occurred with Mr. Funaro, they would

3    frequently say his name, and I don't think there is anybody in

4    the world who thinks that is sophisticated to put your name on

5    where you want this transaction -- how you want this

6    transaction to proceed.  Oh, yeah, if you have trouble get

7    James Funaro and use that name.  That sounds like the opposite

8    of sophisticated, Your Honor.

9         I think what it was, was my client was trying to

10   achieve a financial flow and that's what he did.  The way it

11   was done was not complicated by him.  The way it was done is

12   how it can be done.  If he had added levels -- I mean, I

13   think -- I think I'd have to shut up right now if he had, in

14   fact, used a name other than James Funaro on any step of the

15   process, but he didn't.  The process steps are -- they are what

16   they are, and he simply -- his involvement is locatable.  I

17   think you can almost say that his involvement made it more

18   locatable than before his involvement at all.

19        So I think it's the opposite of sophisticated, Your

20   Honor, and I don't think I need to belabor that.  I really

21   think that if you want to be sophisticated you are going to do

22   things that hide things.  Well, Mr. Funaro did exactly the

23   opposite.  He did things that revealed things.  So thank you.

24        As to whether the other one applies, no for the same

25   reasons, Your Honor.

1    THE COURT: All right. And I do want you to keep

2    giving me the whole Defense perspective, not just the

3    guidelines.

4    MR. FAGAN: Okay.

5    THE COURT: All right. Allocution, overall sentencing

6    factors, because I think everybody blends together to some

7    extent in this case.

8    MR. FAGAN: All right. It does.

9    Well, Your Honor, I will start at the beginning and

10   say when this case began Mr. Funaro came up from Georgia, and I

11   met him before court and during the proceeding, which was I

12   think an arraignment, he leaned over to me and he said, I want

13   to proffer. I want to get this done, and I said, well, usually

14   we get you arraigned before we do a proffer, but yeah. So we

15   did. We got him arraigned, and that same day we arranged for

16   my client to proffer. He proffered like an open book, and he

17   proffered twice.

18   I think what it revealed -- and I was at the proffers,

19   of course. It revealed that this was a man who really looked

20   at this matter. He admitted readily he had done wrong. He

21   was -- he was somehow attracted to what might have looked like

22   easy money, but as he explained, what he was -- his involvement

23   was, is I think he was approached and said, I can do that.

24   Here, let me show you how. And his approach was one of fixing

25   a problem. Now, that doesn't excuse, obviously, doing a crime,

and Mr. Funaro readily acknowledges he did the crime, and he
knows he did, but I want the Court to know, and I'll remind the
Court that as he -- as this went along, this less than year
that he was working in this laundering business with Mr. Gagne,
he became wise to it, or wiser to it, and simply walked away.
He was invited back a second -- he walked away, was invited
back, and he was invited a second time to come back in, and he
refused.  So I think that is a lot of the story for Mr. Funaro.

The financial part of it, it is true he did make some
money in that 10 months and I can't deny it.  It's nothing like
the money that those people who were running this thing made.
It isn't like he was a COO or anything.  He was the technician
that enabled money to move from A to B to C to D to E, and he
did it and he got his five percent on some of that, and that's
how he got paid, but as I noted in my sentencing memorandum, my
client never drove a Maserati, and my client simply didn't try
to rise in the world of crime.  He found himself in a bad spot
and got out.

So my argument, Your Honor, is my client is not
perfect, but my client, when he figured out that he was
involved in something wrong and ugly, he got out.  And he can't
do more -- he can't be less cavalier than he has been by
saying, I want to fix this.  And he has said to the agents --
in fact, he said, look, I think I could show you how this --
this stuff works, because it's fascinating to me the way these

1    -- not the criminal aspect so much as the actual computer

2    aspect of it.  He has a real desire to pursue mathematics and

3    computer work, and he is apparently very bright.  He has done

4    -- he is very good at it, and what he has done since he was

5    arrested, Your Honor, is I think the real mark of the man here.

6    He went back to his employment in Atlanta, and the Court has

7    seen the letters.  He has really confronted this wrong and

8    said, I will do better, and he has done nothing but better from

9    what I gather.  I think -- I think he was a fool to engage in

10   quick money and I think he would probably readily acknowledge

11   that.

12          That being said, Your Honor, he is a man with some

13   remarkable capacity, and I think that a sentence which puts him

14   in prison for any great length of time is inappropriate and

15   excessive.  I think Mr. Funaro -- you know, we want to know

16   that somebody has learned a lesson, and with many sentencings

17   we've all had and the hope is -- at least from me with my

18   clients, my hope is always, maybe you've learned -- maybe you

19   have learned your lesson and you are not going back on the

20   streets or you are not going to do this.  Well, I don't have

21   any question in my mind, Your Honor, with this man.  His life

22   is the story that we'd like our clients to be.  I did wrong.  I

23   want to do right.  I am going to do right.  I'll fix what I did

24   wrong.  He saved money to pay money back.  Not many clients

25   have I had who have saved money knowing that they owe money.

1    It's like, I've got to repay this and I am going to repay it

2    and here is how I am going to do it and he's been doing it.

3         So Your Honor, I really can't think of many more

4    positives I can say about my client.  The guidelines --

5    regardless of what the guidelines are -- there is a 5K pending,

6    and regardless of what the guidelines are after a 5K there is

7    still a fact that this man probably is not in your classic

8    heartland of cases.  He is, I think, particularly unlikely to

9    ever commit criminal conduct.  I think he has learned his

10   lesson in spades, and I think his future plans, which include a

11   doctorate or a Ph.D. I should say in math, and other work in

12   math and science, are noble and worthy things.

13        So we are not here to laud my client, but I am here to

14   recognize the right things he has done and I'd like the Court

15   to consider them in deciding what kind of sentence is

16   appropriate.  So many of the fears we have or so many of the

17   factors that exist in 3553(a) factors are sort of non-factors

18   for my client because he is not going to do those things.  We

19   don't have to preserve our society.  I mean, from him, if we

20   did, they'd have caught him by now being crooked.  He produced

21   a budget.  He shows where his money goes.  He has really done

22   all the things you wish a Defendant would do.  And the Court, I

23   know, has to look at the guidelines, but the Court knows as

24   well as I do it does not have to apply guidelines which are

25   greater than necessary.  So thank you, Your Honor.

1          THE COURT:  All right.  Thank you, Mr. Fagan.

2          And I do want to give you a chance to speak directly,

3     Mr. Funaro, if you want to.  It's not an obligation.  It's an

4     opportunity, and it's only that, but if there are things you'd

5     like to say directly, this is your chance and I'd be happy to

6     listen.

7          THE DEFENDANT:  Please.  Thank you.

8          MR. FAGAN:  Do you want him to stand?

9          THE COURT:  It's probably more comfortable for

10    everybody if you just go to the podium and join your lawyer

11    there.

12         THE DEFENDANT:  Thank you for having me here today.  I

13    was reminded to speak slowly and not at my fast pace when I

14    usually discuss things with Mr. Fagan, and I appreciate the

15    government for their role in having me here, because if I

16    wasn't here today I wouldn't have -- I wouldn't have gone back

17    to school and I wouldn't have found something I want to do for

18    the rest of my life.

19         Before I committed this crime and during the

20    commission of the crime I was training heavily in mixed martial

21    arts, as is known, and I knew that by the time I was 40 in a

22    few years I would no longer be able to compete, and that was

23    very upsetting because I would have nothing left to do with my

24    life.  I wasn't really sure what was going to go on, and once I

25    was arrested I went back to school and I discovered all this

free and cheap affordable education I could receive, and especially with computer science, and because of that I found math and I found something that I love so far.

I am not terribly gifted.  I appreciate the kind words.  I am still in undergraduate.  I am currently completing up calc 2 and linear algebra, but I have certainly found master's programs I want to pursue, computational math in Texas.  I have reached out to many professors just for their guidance, you know, what papers should I read?  How can I get into grad school?  How can I pursue research?

And just like when I committed this crime, you know, which I did, it's about problem solving for me, and I saw even this whole case as a problem solving.  How can I -- you know, I know I am facing a long prison term.  How can I, you know, finish all of this while I am in prison?  And I found a college in Athabasca in Canada where I can -- I can do research once I do a few more classes with them where they'll sponsor me for research while I am incarcerated so that when I come out I will be ready for grad school, because you need to do research to get into grad school, and that's something I can pursue, you know, for the rest of my life.  I don't have to be in physical shape and be able to train mixed martial arts or anything like that to pursue this.  It's something that interests me and it's problem solving.  It's something I want to do.  And so for that I am very appreciative of the fact that I was arrested.  If I

1    was never arrested I don't know if I would have found that.

2         So I am excited for the rest of my life regardless.  I

3    am appreciative of whatever sentence I receive.  I am prepared

4    as best as I can for reentry, you know, afterwards.  I have

5    found a lot of resources, you know, halfway houses,

6    transitional homes.  Found --

7         I have spoken to Publics and Kroger.  They will hire

8    felons.  My friend Richard in the pews back here has offered me

9    a place to stay.  I do know that my job is willing to have me

10   back, of course, but I want to prepare for the worst.

11        You know, I should have -- when this first happened I

12   should have just called up my father and said, hey, I am broke.

13   I want to come home, I am 36, and just accepted it.  But I --

14   you know, I was prideful and I was really hoping that at the

15   time that I was going to get married.  There was a discussion

16   where, hey, if you can get this business going off and figure

17   something out or find a job that's not bartending at the time,

18   which is what I was doing and I was doing, you know, well, but

19   that's not -- it would be hard to have a family that way, that

20   we can get married in, like, six months we can do it.  And I

21   tried and I failed at selling financial services, and I came

22   across this and I thought, wow, I can make 10 grand this month

23   and buy more leads or do this and get back on track and we can

24   get back together and get married, and she decided ultimately

25   no, thank you, and that's okay.  You know, I understand that.

And after a while there was no more point to doing this.

But I have to say, you know, it's led me here, and again, I wouldn't be in school.  I wouldn't have something to do in the future.  I immediately went to work at Blake's.  It's one of the busiest bars in Atlanta, and that's how I met a lot of my friends.  If you had time to read the letters, which I appreciate, I think I've had that great of impact there.  I routinely worked or have worked six or seven days a week.  I started off on the floor.  I am not above anything.  I clean up trash.  I bring trash out to the garbage, you know.  When customers make a mess, I clean it up.  You know, I put on gloves.  I unclog toilets.  I was fortunate enough to move up to bar back where I can do more.  I still have those duties, but you know, now I run up and down stairs all day with ice and bottles of liquor and beer for the bar.

You know, I am not -- I am not trying to be some -- live some lavish life-style or anything.  I am a hard worker -- and yeah.

School has been going great.  I found ways I can continue, as I said, education and school.  Education, excuse me, in -- within prison even.  I do have offers for internships through friendships I have made mostly at the gym because I only go to the gym and I only go to work.  I don't -- I don't do anything else except hang out with my animals at home.

And through those relationships I have built at the

gym and at work I have referrals for internships and possible
jobs or at least referrals for when I finish my degree.  There
is one I spoke to -- also myself I reach out to people,
persevere.org, which I -- of course, I understand my position,
right, in the criminal justice system, where they offer coding
boot camps and programs to the incarcerated at the metro
Atlanta facility, which I wouldn't be able to work directly
with pre, post or during, of course, but I would be able to
volunteer with and when everything is over I could work with
them as a software developer, a trainer or something like that.

        I certainly want to do something like that.  I want to
pursue the higher education, which would preclude me from
having a full-time job during the day but would allow me to
keep working at this bar, which I make decent money, I think,
you know, and could pursue academics until I am ready to be
able to work a job during the day.  And I have told many people
there I'd like to work a job during the day eventually, and
then work at the bar on the weekends, and because I know -- I
mean, I don't know how it works, but I am sure you're going to
say, hey, you owe us this much every month, and I want to be
able to pay that back but also build, like, a nest egg so I
don't ever have to get into a position again where I am broke,
and, you know, I don't have to make the wrong decision.

        I don't know.  I have done a -- all I can say is I
have done a lot of planning, a lot of thinking.  I believe

myself to be a morally good person.  I understand that I am --
my position here that means I have done something morally
incorrect and I did have to think about that for quite some
time in how to kind of figure out how that works if I think I
am a good person, and I have come to understand that I have
chosen to live under the laws of this country, whether I agree
with them or not, I make a conscious decision every day to be
here, and so I choose to be governed by them and I chose to
consciously violate those, and that is where my moral wrong is,
and it did take me a bit of time to, you know, figure something
out truly towards my belief system and such.

I'm sorry if I'm going all over the place.

THE COURT:  Take your time.  This is your chance.
Take your time.

THE DEFENDANT:  I'll finish up in a moment.

I have the reference letters that I received.  I do my
best at that bar.  You know, I have helped -- I have helped
with arrests when customers were assaulted.  I have gotten
people kicked out where I wish I could have gotten them
arrested because I know that they are predators and I've seen
what they do but I didn't have anything on camera, or you know,
just the way that that type of predator activity is it's kind
of hard to get the people arrested.  I have stopped people from
walking people out that they shouldn't be going home with.

I look out for everybody there, and I am grateful that

they look out for me and have provided those letters, and I was very touched that they did, because I don't hang out with people.  I stay home.  When people ask me to hang out I say, no.  Thank you.  I don't like going out with people.  I like to stay home.  I don't let people over at my apartment.  It's just me and my cat and a dog and I have a futon and a computer desk and that's it.  When they arrested me I had -- I don't think I am different or special in a way, but maybe, like, I just have an air mattress, you know.  I don't -- I don't do things like that.  I just -- I just want to move forward.  I just want to serve my sentence.  I want to get through my education and have a good life.

I think that's all I have to say.  I want to serve my sentence, however it may be, finish my education and continue if for as long as I can and have a good life.  Thank you.

THE COURT:  Where are you in school now, Mr. Funaro?  Where are you in school now?

MR. FAGAN:  Where are you in school?

THE DEFENDANT:  I take -- for reasons of affordability and for my own work schedule I take all my courses self-paced through various schools.  So I will be utilizing for the next courses at what's called wescottcourses.com, which is an extension of the University of Massachusetts.  Then there is differential equations I'll take at West Texas AMU.  These are all self-paced individual courses that you purchase.  I will

1    later transfer them into TESU, which is a New Jersey state

2    school, and that'll allow me to double major in math/computer

3    science once I finish up one full term with them because I want

4    to avoid the tuition labor waiver.  And then from there I do

5    believe I could finish up in about a year and-a-half from now

6    because I can accelerate through self-paced classes, and I

7    spend almost all of my time beyond work studying because I do

8    enjoy it.  I want to take a little bit of time for research,

9    which I think will be at Athabasca University.

10               THE COURT:  That's the one in Canada?

11               THE DEFENDANT:  Yes.  That's my backup plan because I

12   can purchase that as a course, which I do need research

13   experience to get into a grad school program.  And then for a

14   master's program I've spoken with the coordinator and a

15   researcher at west -- no -- at Texas AMU for computational

16   math, because I have also applied for his research.  It's

17   called an REU, sponsored by the national science foundation,

18   for a research position I've applied to over the summer, and

19   I've also applied -- I am being helped -- there is that Ph.D.

20   student at my job.  He is the partner of one of the letter

21   writers, John Browning, who wrote that letter for me.  He is a

22   Ph.D. in computer science, and he worked with, it's called

23   scioth.org.  They are a scientific computing organization that

24   promotes web based -- a web based organization for scientific

25   computing between universities and research.  So he can help me

1        prepare or will help me if I am able to prepare for a research

2        position that starts in the fall for that.  And that's a

3        computer science organization.

4                THE COURT:  So thank you.  When you scroll ahead and

5        imagine getting your Ph.D. in math, what do you see doing with

6        that?  Do you anticipate teaching, working, computer coding,

7        some combination or don't you know yet?

8                THE DEFENDANT:  I learned really quickly that I don't

9        want to make web pages for a living because that's not

10       interesting and it doesn't really do anything, you know, and I

11       just want to learn a lot.  Ultimately I would like to earn a

12       Ph.D.  I appreciate the kind words.  Yes.  I would like to do

13       that because I want to pursue research, so that's the natural

14       progression.  I don't know if I am bright enough for however

15       long it will take, but however long it takes me I am positive I

16       will pursue research even if it's independent under other

17       professors.  I know I'll certainly get my master's, and I would

18       pursue a Ph.D.  If I am denied from all the programs I know

19       that I will still pursue research on my own, and with the

20       connections I have I like the idea of mathematical physics.

21       Used to read all the Stephen Hawking books, and you know, they

22       found out, oh, black holes emit radiation even though they are

23       not supposed to.  How did they figure it out?  They did a bunch

24       of math, and the math says it helps, and so that's a

25       fundamental understanding of the universe, and I think that's

1    really cool.  So I would like to pursue that.  And luckily

2    there is a topic, algebraic geometry, which applies to

3    mathematical physics but also to computer science.

4        So I can kind of -- you know, that's what the research

5    over the summer that applied for algebraic geometry and

6    computer science.  They look how to solve equations faster

7    using a computer basically, and that makes the computer faster,

8    of course, and that's a wonderful thing.  It's kind of a

9    bottleneck for algorithms.  That's really interesting to me

10   because that solves -- that solves problems.  It's not, oh,

11   look at my web page, buy my product.  I guess that solves a

12   different sort of problem, but it doesn't really interest me as

13   much.

14       I just want to learn.  I see math as it's like I want

15   to learn as much as I can about, you know, like, why we are

16   here.  Why is there a universe?  What is it?  And yeah, I get

17   that.  That's really what kind of drives me, and that's why I

18   am looking at doing it because eventually the next course I can

19   take will show me I can learn that.

20       You certainly can have a good career with math

21   undergrad, master's or a Ph.D.  With the research project that

22   I would apply for -- I am not saying I am getting it.  I would

23   love to, of course, but the one in the fall with the scioth

24   that I mentioned, that's for scientific computing related to

25   the field of things I'd like to learn.  And you can have a

1      great career in that that would move into scientific machine

2      learning.

3              And machine learning is the next big thing that's

4      taking over artificial intelligence.  A lot of the software

5      engineering jobs people will rely less on as a way to get

6      artificial intelligence and machine learning advances, and

7      those have some highly paid careers.

8              I am not interested in just in a highly paid career.

9      I want something that's cool to me, like the bar that I work

10     at.  I make decent money there and they've told me that I can

11     become a bartender.  I have bartended in the past for years but

12     you can't start as a bartender there.  You have to start out

13     hauling trash because everyone has worked there for five, ten,

14     fifteen years or so.  But I know that I can be a bartender

15     there.  They want to know that, you know, my sentence is served

16     and everything is ready to go.

17             And they are fully supportive of school.  I have asked

18     several times if I could take a week off or a couple days off

19     here and there so that I could finish up a class.  Even though

20     they are self-paced I knew that I had to get as much as I could

21     done, and that was also a nice problem.  I am not going to lie.

22     Like, how much can I get done before -- you know, before I go

23     to prison?  How can I set myself up as good as possible?  Can I

24     finish all of calculus so that when I get there I can start,

25     you know, I don't know, I don't know, abject algebra?  But they

1   have been very supportive and I appreciate them.  They are --

2   again, I don't go out or do things like that in general, but

3   that's the place that I am out in public, the only really, and

4   it's been great being there and they are supportive of school

5   and everything.

6          THE COURT:  All right.

7          THE DEFENDANT:  I will wrap up.  Sorry.

8          THE COURT:  No.  Last question, which is a totally

9   different topic.  When we look at the way the probation officer

10   scored your criminal history, there was a time in your life, at

11   least 10 years ago it looks like, that alcohol, maybe other

12   substances, were an issue for you, got you into trouble.

13          THE DEFENDANT:  Correct.

14          THE COURT:  And working in a bar you are around

15   substances all the time.

16          THE DEFENDANT:  Correct.

17          THE COURT:  Have you taken steps to address it?  Do

18   you feel like you have mastery over substances or is there

19   something else that changed in your life or is it still a

20   challenge?

21          THE DEFENDANT:  Is it still a -- is there something I

22   have done prior?

23          THE COURT:  So I see the two convictions that were

24   scored, an earlier one that wasn't, and nothing since.  So in

25   10 years -- I mean, maybe you just stopped driving and alcohol

1    and other substances are still an issue.  Maybe you took other

2    steps to deal with alcohol or substances, and I am just curious

3    if you are able to address it?

4          THE DEFENDANT:  Yes.  Of course.  So I went to the

5    drug court in Nassau County in Long Island, which is in New

6    York.  And part of that was, okay, you are in 18 months -- I am

7    sure it's similar in other states -- 18 months of classes.  And

8    of course, you get tested, and then they, you know, overt your

9    sentence.  I never applied afterwards to seal it or do anything

10   with that.  Just, okay, I am not going to jail.  But I followed

11   it.  And after 18 months of not drinking, not partying, just

12   working and doing what I had to do, I stopped drinking.  I did,

13   of course, lose my license and I have never applied for it to

14   get back.

15          I have corneal dystrophy.

16          THE COURT:  What's it called?

17          THE DEFENDANT:  It's called corneal dystrophy, a wax

18   buildup in your eye.  I did go to the doctor.  I have great

19   insurance.  I also love that about my job.  My job is

20   wonderful.  They recently -- they give us now five percent of

21   our yearly salary into a 401K, which I've never had before, and

22   then they'll match three percent.  We have amazing health

23   insurance for, like, $200 a month.  It's the best.

24          So I did -- I went to a doctor to address it.  I was

25   hoping that some new surgeries would work out for me.

1    Unfortunately, the form of corneal dystrophy I have is too

2    thick into the eye.  It's a combination of dystrophies.  And so

3    the only surgery available to me is very intensive.  They

4    basically cut out the entire cornea and give you a new one.  It

5    takes six to twelve months to recover from.  I am hoping in the

6    future there are better surgeries.  And that's the reason I

7    don't drive.

8         I can't see out of my left eye.  I don't have depth

9    perception.  And I mean, I have to write this in an 18 font.

10   That's why I don't really read any textbooks because I blow

11   up -- I blow them up on my screen through a PDF and I watch

12   lectures.

13        It's too bright outside, too, the sun.  The light even

14   when I ride my scooter during the day I have to wear a pair of

15   sunglasses to get to work or else I have to just walk because I

16   can't see in front of me.

17        There is a surgery that's not approved in the U.S.

18   yet.  I have spoken to a manufacturer.  It would work for me,

19   but I'd have to do it in Europe or the Middle East or Canada

20   where they have artificial corneas.  I am hoping that in a few

21   years it will be FDA approved here, and that would involve my

22   problem of having a new cornea.  My father did have the corneal

23   transplant and he still needs, you know, very large texts.  He

24   is an accountant.  He is an accountant on the side and an

25   electrical engineer at Brookhaven National Laboratory, and you

1    know, he still needs everything to be blown up and enlarged so

2    I am holding off.

3    I do -- I spoke to my lawyer -- Mr. Fagan -- thank

4    you, who has taken time with me before this to go over all my

5    questions, and one of my questions was concerning my eyesight,

6    and that if it's possible, you know, once I realize how long

7    it's going to be, I might want to get a corneal transplant.  I

8    don't want to really have my right eye get attacked and just

9    when I can't see so that I can read while I am serving my

10   sentence and can do the education.  So I

11   would -- I was wondering, is it delaying reporting, so that I

12   can receive the surgery.

13   And then back to the original question, yeah, I

14   stopped driving because I can't see.  I stopped drinking

15   because I didn't do it for 18 months and there was no reason to

16   do it again, and then people would say, hey, do you want a

17   drink?  And I just don't -- there is nothing to it anymore.

18   You know, it's not what's the point of feeling stupid.

19   THE COURT:  Okay.  Thank you.

20   THE DEFENDANT:  Thank you.

21   THE COURT:  Anything else, Mr. Fagan?

22   MR. FAGAN:  Only a couple things that I forgot.  Very

23   briefly.  I guess I am asking that my client be -- if he is to

24   receive a sentence of incarceration that he be allowed to self

25   report.  But additionally, he has identified -- if he is

required to go into prison, he has identified a camp called

Lewisburg -- or a prison, FCI Lewisburg, in Pennsylvania, which

he believes would be appropriate because it has lots of -- has

lots of things that he is interested in.

So the eye surgery thing we did talk about, Your

Honor.  He doesn't think that the surgery could be done in a

prison, and if it were to be done if he were waiting on it now,

he'd have to wait I think it was six months before he could get

in at the earliest to deal with that left high.

I am not sure that's a reason for self -- to delay the

report.  I am asking for self report simply because my client

is, I think, eligible for it and I would ask for that.  Thank

you.

THE COURT:  All right.  Thank you.

Ms. Carowan?

MS. CAROWAN:  Thank you, Your Honor.

It's clear from Mr. Funaro's own statement he has

obviously accepted responsibility for this.  He did so very

early on which is why the government is making a 5K motion in

this case.  They are moving for a two-level reduction in his

offense level for his substantial assistance in this matter.

Mr. Fagan is absolutely correct that he came to me at

arraignment and offered to proffer.  We were able to set it up

that afternoon.  Given that Mr. Funaro doesn't live in the

district we wanted to take advantage of him physically being

here.  He has stood ready since that time to assist in the
investigation.  He provided us some electronic evidence and
other things as outlined in my motion, so we are making that
two-level request of the Court this afternoon.

Turning to the other outstanding guideline issue, I
briefly address the sophisticated means, so I'll sort of limit
this argument to sophisticated laundering, and really, this is
sort of the textbook sophisticated laundering case.  You know,
I cited the Vela-Salinas case in my sentencing memo that the
calling for layering transactions or multiple transfers has
been held sufficient to apply the particular two-point
enhancement, and also, the application notes, again, should
they survive Havis and Bicardy, give some guidance as well to
what perhaps should be considered for sophisticated laundering,
and they talk about fictitious entities, shell corporations,
again, layered transactions and offshore accounts.  And in this
particular case the money laundering scheme involved almost all
of those.

And I would posit to the Court that Mr. Funaro using
his own name doesn't necessarily make it not sophisticated.  In
fact, that actually in some respects is an attempt to make it
look legitimate in this particular case, and we do have a
situation where individuals were asked to pay for drugs via
these alternative payment methods.  They were told
specifically, don't say anything, don't use your name, don't

1    use the drug name, that ExpressPTC.  Just use your order

2    number, which I think is significant.  Those funds then either

3    went one of two places primarily, either to Mr. Funaro's own

4    accounts or to the accounts a shell corporation, which is

5    Valiant Capitol, which is a company that Mr. Funaro established

6    in New York state.  It doesn't appear to have any employees or

7    any legitimate business, but it did have bank accounts through

8    which much of the money in this case was laundered.

9         The layered transactions, again, it would go from

10   Valiant Capitol to Mr. Funaro's account to a cryptocurrency

11   wallet.  It could get converted to cryptocurrency.  In some

12   situations it would then go to another cryptocurrency wallet.

13   At some point you get to a cryptocurrency services provider

14   that unfortunately either commingles to such an extent that

15   deciphering the block chain is difficult or alternatively is

16   not subject to the U.S. legal process.  And that was all part

17   of this as the funds were moved off shore as part of the money

18   laundering scheme.  So from the government's perspective this

19   is sort of a textbook sophisticated laundering operation and we

20   would ask for the two-point enhancement on that.

21         THE COURT:  So the elements that I remembered reading,

22   I was with you on -- in the PSR all the way to that last one.

23   I don't remember seeing in the PSR discussion of what I would

24   call, you know, mixing sites that clean the bitcoin or even

25   offshore bitcoin.  Is that in the PSR somewhere?

1    MS. CAROWAN:  The offshore -- moving off shore I think

2    is actually in the factual basis of the plea agreement where it

3    talks about the money ultimately --

4    THE COURT:  They ultimately paid it off, but are you

5    saying that there was, you know, a bitcoin or some other crypto

6    place that he went?  And I can't remember if you were involved

7    in the earlier crypto case I had involving mixing and cleaning.

8    MS. CAROWAN:  I was not.

9    THE COURT:  Okay.  That's what I hear you saying, and

10   I didn't see anything like that in here, which is why I'm

11   asking.

12   MS. CAROWAN:  Sure.  And I may have -- I may have sort

13   of spoken to you rapidly for my brain to catch up, Your Honor,

14   but I think what I was trying to demonstrate is, again, this

15   sort of layered transaction, the multiple wallets, the multiple

16   cryptocurrency providers, before ultimately moving the funds

17   overseas to -- either to co-conspirators who resided overseas

18   or to any other pharmaceutical manufacturers and other

19   individuals to pay for additional -- additional drugs.

20   THE COURT:  Okay.

21   MS. CAROWAN:  Does the court have any other questions

22   on that?

23   THE COURT:  No.  That was the one I wanted to get.

24   MS. CAROWAN:  Regarding 3553(a), Your Honor.

25   ExpressPTC did business in the millions of dollars.  We know

that from Mr. Funaro's case by itself.  Initially it only
operated in cryptocurrency, but at some point it expanded its
customer base and ultimately offered multiple payment options.
I certainly understand that Mr. Gagne made a statement in his
proffer about that not expanding the business extensively or
anything like that.  I would posit to the Court that Mr. Gagne
is perhaps not the best source of information in that regard,
particularly when you look at the amount of money that was
moving through the website and through the money laundering
scheme.

Through the money laundering scheme, Mr. Funaro and
other co-conspirators essentially created the method whereby
more and more customers could use this website.  So if you
didn't understand how to use cryptocurrenty or get a bitcoin
wallet or sort of engage in that particular type of
transaction, Mr. Funaro and the co-conspirators on the money
laundering side made that possible and ultimately used that
method to launder nearly 1.4 million dollars.

And as I indicated it was an extensive method.  There
is a sham corporation.  There is multiple bank accounts.  There
is transfers to cryptocurrencies exchanges, and all of that was
both to conceal the money laundering and the source of the
funds and then also to promote additional money laundering.  I
mean, ultimately this is a serious offense.  It's almost 1.4
million dollars.  This is a situation where at least some

1        incarcerative sentence is appropriate.

2                And it was particularly jarring to me in fairness, in

3        this and in some of the related cases, that the Defendants at

4        least initially didn't take their actions seriously.

5        Mr. Funaro actually stated during the presentence interview

6        that he, quote, did not believe anyone would care about what he

7        was doing.  That's pretty jarring given that what he is doing

8        is illegal conduct.  Just didn't think anybody would care.

9        Certainly based on his statements this afternoon that has

10       changed, and I think that is to his credit with his acceptance

11       of responsibility, but the sort of cavalier attitude that we

12       have seen throughout the case is concerning for reasons,

13       frankly, of general deterrence.  We have a number of schemes

14       like this that are perpetrated all the time across the country

15       to do exactly what these particular individuals did, which is

16       to import misbranded prescription drugs into the United States

17       illegally to be sold for profit, illegally circumventing the

18       customs regulations and circumventing the FDA.  And that's --

19       that's concerning, and I think on some level there needs to be

20       a general deterrent element to a sentence in this particular

21       case because ultimately, you know, this was a profitable

22       business.  Mr. Funaro and Mr. Gagne and others made money

23       without a lot of effort.  You essentially did it on your laptop

24       or even your cell phone.  That's tempting to a lot of people,

25       and that's concerning going forward that this type of crime

1    will be repeated.  Maybe not by Mr. Funaro but by others.  So

2    we are asking that the Court impose a sentence that includes

3    jail time, and I can answer any other questions the Court has.

4              THE COURT:  I don't think I do right now.  Thank you.

5              MR. FAGAN:  Your Honor, may I very briefly reply to

6    one comment?

7              THE COURT:  Sure.

8              MR. FAGAN:  The cavalier word.  My client, when he was

9    reviewing the government's presentence memorandum, responded to

10   me on Friday -- on Thursday last.  He said -- he said to me, he

11   said, I suppose it's too late now, but -- and not worth much he

12   wrote, but it's the official policy of the FDA to not enforce

13   the law when a package is for personal use.  That's why I

14   stated I didn't think they cared about generic medications,

15   which the report implies means I have a cavalier attitude

16   toward the law.  Quite the opposite.  I had researched this

17   prior and found the FDA allows 30 to 90 days worth of personal

18   use non-schedule drugs to be imported as official policy.  I

19   didn't think they cared because they quite literally did not

20   care as official policy.

21             Well, Your Honor, I looked it up.  The FDA, in fact,

22   has what's called a personal use policy that says that while

23   importing unapproved drugs is illegal, the FDA's long-standing

24   policy explained in the FDA regulatory manual is not to enforce

25   the law where drug importation is for an individual's own

1      personal use in certain circumstances.

2            I believe that was my client's understanding, and I

3      don't want to get lost in the weeds there, but I think that if

4      there was a cavalier -- what was considered cavalier by the

5      government, I think it is that my client had actually -- he

6      indicated to me, had actually researched it and thought, well,

7      it doesn't appear to be a thing that's a violation of the FDA.

8      So that doesn't make any of the criminal things right.  He

9      just -- that was what was behind that thinking.  Thank you.

10           THE COURT:  All right.  Ms. Carowan, anything else?

11           MS. CAROWAN:  I would just briefly point out that that

12     policy by Mr. Fagan's own admission doesn't apply to controlled

13     substances.  There were schedule III and schedule IV controlled

14     substances as part of the underlying conspiracy on the

15     smuggling side.  I would also point out some of the drugs that

16     were sold on this website are dangerous.  At least one of them

17     had an FDA black box warning on it which essentially says, hey,

18     if you take this wrong you could die.  Short and sweet.  And so

19     from that perspective I think this isn't just about personal

20     use medication, and so from the government's perspective the

21     way people were thinking about this conspiracy overall is

22     significant.  Thank you.

23           THE COURT:  All right.  Thank you.  Thank you, counsel

24     at both tables and Mr. Funaro for his comments as well.

25           We always start a sentencing determination with

guidelines, and in this case we'll do that, too.  There are
some disputes and issues with the guidelines, and in all these
cases I have opened my own comments by saying that in my view
it's not a case where there was consumer fraud, that is,
downstream fraud where people who did use the site to purchase
the drugs, whether scheduled or otherwise, whether legal or
not, got anything less than they thought they would get.  I
think they got exactly what they thought they would get.  In my
mind this is a regulatory fraud or fraud on the government
case, but you still have to have some way to measure the
relative culpability, and even though I am not totally
satisfied that the fraud guideline does that through its
various cross references, through the different pathways and
guidelines we have, it is at least a comparable place where I
can plot people involved in the underlying activities here that
were wrong and do some comparisons, and so for that purpose I
use it, including the special application note 3(F) rule that
was identified by Ms. Carowan and that we've been using either
by multiplying packages by an estimated value or in the case
here for Mr. Funaro of using the dollar amounts that were
connected to the site.

        With that caveat to begin, I do believe that in the
case of Mr. Funaro the right guideline to start with is 2S1.1,
and I do believe that the right pathway, either (a)(1) or
(a)(2), is actually (a)(1).  That's not what was included in

1    the presentence report.  That's not what the parties initially

2    looked at and briefed.  Things have developed since then, and I

3    appreciate everybody taking another look at that with me, and I

4    think that we are on the same page that we should use the

5    (a)(1) pathway that does point us back to the fraud guideline.

6    That does start with a base offense level six, not eight.  The

7    amount of loss, though, is still at plus 14 given the $1.3

8    million number associated with the laundering of the smuggled

9    drugs in this case, and that's also part of the plea agreement,

10   and I think it fits here with the caveat I noted.

11        The presentence report also had six points added for

12   2S1.1(b)(1) that no longer applies, and similarly a four-point

13   level under 2S1.1(b)(2)(C) that no longer applies.  Instead,

14   you simply get the two levels for a conviction under 1956.  So

15   that's six plus fourteen plus two more and that puts us at 22.

16        The disputed issue, then, is over the sophisticated

17   laundering, which could add two points under the laundering

18   guideline itself, and potentially the sophisticated means

19   enhancement that gets picked up under the fraud guideline if

20   the sophisticated acts are based on independent facts.  I think

21   Ms. Carowan is right about that.  That's the way I read the

22   case law, too.

23        So let me start with the sophisticated means, not

24   sophisticated laundering.  It's under the 2B1.1 regimen, and I

25   don't think it applies to Mr. Funaro here.  The particular

application of that sophisticated means, not just from the application note but from the text itself, requires both otherwise sophisticated means and that the Defendant intentionally engaged in or caused it.  I don't think we have that prong established here with respect to the underlying smuggling operation, which was largely in effect and for which initially at least Mr. Funaro was a customer as much as anything else.

Potentially, as Ms. Carowan has argued today and in other cases, the 10(b) applies that a substantial part of the fraudulent scheme was committed from outside the United States, but I think, as I have indicated in some of the other cases, there still has to be at least some reasonable connection between the Defendant and that element of sophistication, and although Mr. Funaro undoubtedly knew from the website, like any consumer, that these drugs were coming from overseas, I have a hard time drawing by a preponderance a two-point enhancement there, because I don't think that that was part and parcel of what Mr. Funaro was fairly involved in, so I don't intend to add those two.

The question under the laundering guideline is a little different.  It's whether there was sophisticated laundering increase by two levels.  And Ms. Carowan says, hey, look, this is, you know, a textbook case.  Look at the application note, fictitious entities, shell corporations,

multiple levels and offshore accounts.  The counter from

Mr. Fagan is when you are talking about sophisticated

laundering, you are talking about hiding, and Mr. Funaro did

just the opposite, and I think there is strength to both

positions.  Ultimately, I am going to sustain the objection and

not apply the sophisticated laundering here largely along the

lines of Mr. Fagan's argument.

There is certainly multiple movements of cash, that's

true, but I don't consider that classic layering in this case.

Similarly, there is an account, at least Valiant, that didn't

have employees or a business model particularly beyond handling

cash, and you can call that a shell company, but when I think

of shell or when I think of multiple layers, I do agree with

Mr. Fagan that, you know, the purpose in all the cases I have

read is to hide what's actually happening, not to illuminate,

and I think that's true actually in the case that Ms. Carowan

referenced from the Sixth Circuit, which was a drug case and

people who operated a car lot and would take the drug proceeds

which came in cash obviously and use a series of deposits and

other things to make it look like all the cash came from the

used cars, not the drugs.

Similarly, I think another case that was cited was

Fish, United States against Fish from the Third Circuit, 731

F.3d 277.  I don't remember if this one was cited but it's out

there.  United States against Sharon, S-h-a-r-o-n, 442 F.3d 881

from the Fifth Circuit, and the common thread I see in all of
those cases is a conscious desire to hide the reality of where
the funds were coming from and who they were going to so that
nobody looking casually would say, oh, I see that cash came
from a website that was selling drugs, and I think that's the
missing piece I see here, and in fact, in the presentence
report one of the indications is that at one point Mr. Funaro
actually suggested to some of the principals involved, well,
why don't I just send the money directly to you in your name,
and they didn't want that, and that strikes me as indicative of
at least from Mr. Funaro's point of view comparative
transparency despite the fact he was moving the money through
multiple places.  And that's paragraph 110 that I am
referencing by the way.

     And I don't understand exactly why you would get
involved in a laundering operation and essentially, you know,
put down not just bread crumbs but giant slices of bread to
lead people to you, but that's what happened, including
Valiant, which was a company formed in Mr. Funaro's own name,
and at least originally in the timeframe supports this for
something other than the purpose of doing this.  And sometimes
people have companies formed because they eventually want to
operate in an entity basis.  To me the shell corporation idea
denotes not just a company that didn't have much actual, you
know, internal plumbing so to speak, but is actually being used

1    in a way to create an impression that's not real, and I don't

2    see that here.  I think the impression was this thing is going

3    to be collecting the cash from the website customers, and

4    that's exactly what happened.  Ultimately it did make its way

5    through multiple accounts, that's true, but they were all

6    accounts in Mr. Funaro's own name or the name of one of his

7    businesses before they were eventually converted, if not

8    wholly, then, at least significantly into various forms of

9    crypto.

10            And all things considered, I do think what Mr. Fagan

11   said toward the end of his argument on this point is actually

12   borne out, that when Mr. Funaro got involved it actually made

13   the process more transparent, and notwithstanding Mr. Gagne's

14   comment that perhaps he didn't anticipate or see a difference

15   in a level of business, at a minimum it became easier to see

16   the total volume of the business and potentially also increased

17   the customer base but in a way that was perfectly visible.

18            So I don't think that under those circumstances the

19   sophisticated laundering actually applies, so I'll sustain the

20   objection.  It leaves us at 22 for the base level guideline

21   with those enhancements.

22            Acceptance of responsibility is, I think, appropriate.

23   I am granting the two levels in my power, and Ms. Carowan, is

24   the government moving for the third?

25            MS. CAROWAN:  We are.

THE COURT:  Okay.  I'll grant that.  And that takes us down to 19 on the chart.  A level of offense 19 and a criminal history of category of II is 33 to 41 months, and that's still higher than what the Defense thinks ought to happen.  It is a custodial sentence.  It's certainly a lot lower than the one that was calculated under the presentence report, and from that point I will consider the other factors that are in play in any sentencing, recognizing that ultimately my job is to craft and impose a sentence sufficient but not greater than necessary to achieve the overall purposes of sentencing.

A place to start I think is the government's departure motion.  Certainly Mr. Funaro from the government's point of view, from the presentence officer's point of view, certainly from Mr. Fagan's point of view, was early and up front and complete in his proffer and ability and willingness to help.  The government says that it thinks it was worth two levels and I think it's -- in this case it's at least two levels.  Personally I'd be more inclined, given the unique position Mr. Funaro had on the cash side of the business, to credit three levels.  In any case, if it's two it's down to 17.  That's, on the chart, 27 to 33 months, and if I go to the three levels that feels more appropriate to me, we are at 16, 24 to 30 months on the chart.

Then the question is are there other reasons for a variance or departure?  And on the one departure factor that I

think is legitimately in play here is the criminal history

category.  It does score out at II because there are the two

points of conviction for the two driving -- or substance

related offense, one driving, but they are about 10 years old.

And the one involved, I think, a controlled release as well,

and it's pretty clear to me that Mr. Funaro put that behind him

in a way that I think significantly reduces the risk of

recidivism and overstates as a result that criminal history.

I do think a category I fits him better.  Not the

completely clean category I that we have seen for some of the

other Defendants but still a category I, and at my level, then,

when I am thinking about what's the appropriate sentence for

guideline purposes after those departures, I am thinking 21 to

27 months on the chart, which is a level of offense 16,

criminal history category I.

Are there other reasons for variance?  Ms. Carowan and

the government's position is, look, this is serious stuff.

It's not necessarily taken seriously by everyone, and that in

itself is an important factor of general deterrence.  The

position from Mr. Fagan, among other things, is, look, this was

serious.  We are not denying that, but to the extent it was

financially involved and rewarding, although Mr. Funaro

benefitted some he didn't benefit as much as others, walked

away earlier than law enforcement's engagement because he

recognized it wasn't for him anymore, and is not going to be a

1    future threat for any kind of criminal wrongdoing.

2           Again, there is, I think, substance to both sides.  In

3    my mind there is very limited risk that Mr. Funaro will return

4    to any kind of criminal activity, and I do believe that the

5    issue involving his comparative gain is a fair point as well.

6           The big factor that I think still needs to be fairly

7    weighed, and it weighs against Mr. Funaro, is the seriousness

8    of the offense and the need for general deterrence, and that's

9    a factor in any case like this, even for someone like

10   Mr. Funaro who has personally gotten beyond it and sees life in

11   a different frame.  And I think there is force to this, and I

12   do think Mr. Funaro, given the scope of his involvement as we

13   measured and under the guidelines, is fairly accountable for

14   something like that.

15          So even though I think there is some strength to

16   Mr. Fagan's arguments for further variance, I don't think I can

17   vary legitimately in this case to a non-custodial sentence and

18   feel like I have achieved all the purposes of § 3553, but I

19   think I can vary down somewhat to a custodial term of 15

20   months, which is still a custodial term that still has

21   substance.  It still points out to people that there is, in

22   fact, loss of liberty associated with this kind of wrongdoing

23   but not a draconian loss, not one that fails to take into

24   account the other positives that have been identified.  So that

25   is the intended custodial sentence of the Court for Mr. Funaro,

1    15 months.

2         I want to comment a minute on the seriousness of the

3    offense prong.  I guess I would put it at that.  The concern

4    that Ms. Carowan has that Mr. Funaro was basically flippant

5    about the experience, that's not the word she used, but a word

6    like it, and I didn't interpret it that way, and I think what I

7    heard and read, and I think Mr. Fagan brought some of this out,

8    is Mr. Funaro saying, honestly, I don't really agree with this

9    law.  I don't think it's a good law.  Whether it's by policy of

10   the FDA that permits personal use or whether it's by Congress

11   changing the rules, I am all in favor of it, but I recognize

12   what the law is.  I recognize I broke it, and therefore, I

13   stand in harm's way and am obligated to pay for that.

14        I see that as a general and a legitimate general

15   deterrence term of the government that you don't want a lot of

16   people to think this is, in fact, cause, or the FDA doesn't

17   care or the government really doesn't care.  But by the same

18   token, I don't think it would be fair to ding Mr. Funaro simply

19   because he disagrees with the law, which is more the point that

20   I thought I was making.  He needs to be accountable and he

21   needs to be in this case partly an example to other people who

22   say, like it or not, this is the law, and if I want to change

23   it I need to do it through the political process, not by

24   breaking the law.

25        The other thing I'll say lastly on that point is the

1   government has lots of enforcement policies, not only when it

2   comes to drugs but other things, too, and it doesn't erase the

3   crime.  It simply says the government has limited resources.

4   We are going to concentrate them on areas where we think they

5   are best used, and in a case like this, if somebody decides to

6   organize a way for lots of people to get involved in, you know,

7   that personal use potential window of opportunity, you are

8   dealing with a whole different kind of activity, much like

9   Napster turned out to be a way that killed, you know, early

10  digital music, but it was no longer just a friend sharing, you

11  know, a tracking music with a friend.  It became a joke where,

12  you know, everybody was my friend and so the musician got zero

13  copyright.  And you can agree or disagree with that, too.  A

14  lot of people did, but if you stole the music you were still

15  accountable.  So that's the way I see that particular issue

16  here.

17       I will certainly recommend to the Bureau of Prisons

18  that they take into account the desire that Mr. Funaro has for

19  the Lewisburg facility, because he's researched it and

20  identified programs there that he likes, and that he could

21  usefully use.  I think that makes sense, and I'll certainly

22  reference for them his particular medical concerns with the

23  cornea.

24       I am not willing to simply delay reporting until a

25  medical procedure could be done because I think it'll take too

long, and it's uncertain -- I am not suggesting it be done in prison, but I think self report in the more traditional way, which we'll talk about, is fine, but not a delay that builds in significant time for a medical procedure.

For supervised release I do intend a period of three years during which the normal mandatory terms will be in effect.  That includes cooperation in the collection of DNA and drug testing.  All the standard conditions, too, including no firearms, and then a few special conditions.

First, that Mr. Funaro participate in a program of testing and treatment for substance abuse as directed by the probation officer, and two, that he provide the probation officer with access to requested financial information so that any ability to pay determinations can be made, and then three, Mr. Funaro needs to submit to the search protocol of the probation office permitting search of person, property, computers, papers and the like on reasonable suspicion.

The financial aspects of the penalty are a little different in this case.  There is a special assessment of $100. That's something I intend to impose.  It's mandatory.

There is no restitution in the case, even though a lot of fraud cases have it.  There just isn't a basis for it here. And then there is a possibility of a fine, and I would ordinarily consider that for somebody with Mr. Funaro's means and his score on the guidelines, but there is also a large

1    forfeiture money judgment for the full amount of -- it's 1.349

2    million I think, or thereabouts, and I'll get the specific

3    number in a minute.  That's a lot of money, and I don't think

4    that there is need for any kind of a fine over and above that.

5         I do want to ask Ms. Carowan, you know, we have the

6    motion pending for that forfeiture.  It's part of the plea

7    agreement so I do intend to add it.  Does the government have a

8    collection plan for that or not?

9         MS. CAROWAN:  Your Honor, I don't have a specific plan

10   to present to the Court.  I have been in touch with our

11   financial litigation unit that sort of does handle that

12   collection, so I think they are aware of and anticipate entry

13   of the judgment and anticipated next steps.

14        THE COURT:  All right.  So what I will intend to do is

15   enter the money judgment consistent with the plea agreement.

16        Forfeiture money judgments don't necessarily take the

17   same pathway that a normal civil judgment does, and the full

18   amount is $1,394,645.60.  You know, that's a lot of money that

19   goes to the full amount of money that came through the site,

20   not the lower amounts that Mr. Funaro personally profited from,

21   but it is consistent with the law and also with the plea

22   agreement.

23        In terms of payment terms during custody, I intend

24   normal custodial payment terms for anything which in this case

25   would simply be the forfeiture judgment, and they are minimum

1    during custody.  Minimum quarterly installments of $25 or

2    minimum monthly payments of $20 otherwise.  During supervision

3    I do intend minimum monthly installments towards that of $100.

4            So that's the overall intended disposition of the

5    Court and the reasons for it, and I'll start with Ms. Carowan

6    for legal objections?

7            MS. CAROWAN:  No objection, Your Honor.

8            THE COURT:  And to go to you, Mr. Fagan, for legal

9    objections?

10           MR. FAGAN:  No legal objections, Your Honor.

11           THE COURT:  All right.  So then I am going to go ahead

12   and impose that as the disposition of the Court, Mr. Funaro.

13   It is a custodial term of 15 months with a self-report date

14   we'll talk about in a minute, three years of supervision to

15   follow on the terms indicated, and a $100 special assessment,

16   and no separate fine or restitution, but the large forfeiture

17   money judgment of the 1.394 million -- and I just said the

18   right number.  $1,394,645.60.  That's the forfeiture money

19   judgment, but the payment terms will apply to that.

20           That's what I am imposing now.  I am going to make it

21   the written judgment of the Court, too, and then you have 14

22   days to appeal.  So you tell Mr. Fagan if there is anything you

23   want to appeal.  He needs to hear it from you so he can put the

24   notice on file within 14 days.  Any questions about that?

25           THE DEFENDANT:  No, Your Honor.  Thank you.

1          THE COURT:  In terms of self report, Ms. Carowan, I

2     can't remember if I gave you a chance to comment on this or not

3     but do you have a position one way or the other?

4          MS. CAROWAN:  Your Honor, we don't object to a self

5     report in Mr. Funaro's case given his performance on pretrial

6     release.

7          THE COURT:  Yeah.  And I think self report is the way

8     to go.

9          Mr. Funaro, as I'm sure you talked to your lawyer

10    about, normally when somebody is sentenced to a custodial term,

11    the general rule is you leave with the marshals right away.  In

12    your case what Ms. Carowan is saying, what your lawyer is

13    asking for, and what I am concluding, is you have really earned

14    the privilege of getting to whatever the Bureau of Prisons

15    designates on your own when the time comes.  It's usually not a

16    matter of days or months.  It's usually a matter of weeks, and

17    then the Bureau of Prisons or the marshal says, here is where

18    you need to be by what time.  Your lawyer will get that

19    information and pass it on to you, and then your responsibility

20    is to get there.  And I know you don't drive, but do you feel

21    like you are comfortable you can get to the place you need to

22    be on time?

23         THE DEFENDANT:  Of course.  I have family, and of

24    course, there is public transportation as far as I can go, and

25    family across the country will help me.  Thank you.

1     THE COURT:  And it may or may not be Lewisburg.  I'll

2     highlight that for them, but that's not my call.  It's their

3     call, and sometimes they look at places closer to where you

4     live or other factors as well.

5          Okay.  Anything else we need to do today, Ms. Carowan?

6          MS. CAROWAN:  I apologize, Your Honor.  I think I have

7     raised this in a number of sentencings.  I just want to clarify

8     for the record that Mr. Funaro has reviewed the presentence

9     report with Mr. Fagan and has had an opportunity to discuss

10    that and is satisfied with counsel?

11         THE COURT:  All right.  You have had a chance to go

12    through all these materials including the presentence report,

13    Mr. Funaro?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.

16         THE DEFENDANT:  Thank you.

17         THE COURT:  And talk about them all with your lawyer?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.  Anything else, Ms. Carowan?

20         MS. CAROWAN:  No, Your Honor.  Thank you.

21         THE COURT:  Or Mr. Fagan?

22         MR. FAGAN:  Nothing else.  Thank you.

23         THE COURT:  All right.  Thank you.

24         THE CLERK:  Court is adjourned.

25         (Proceeding concluded, 5:36 p.m.)

```
 1                        REPORTER'S CERTIFICATE

 2

 3          I, Paul G. Brandell, Official Court Reporter for the

 4     United States District Court for the Western District of

 5     Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foregoing is a full, true and correct transcript of the

 8     proceedings had in the within entitled and numbered cause on

 9     the date hereinbefore set forth; and I do further certify that

10     the foregoing transcript has been prepared by me or under my

11     direction.

12

13

14                         /s/ Paul G. Brandell

15                         Paul G. Brandell, CSR-4552, RPR, CRR

16                         U.S. District Court Reporter

17                         399 Federal Building

18                         Grand Rapids, Michigan  49503

19

20

21

22

23

24

25
```